50

In the Matter of MARTIN T. CAREY, Petitioner, v DONALD KITSON, as Acting Judge of the County Court of Suffolk County, Respondent.

Second Department, April 4, 1983

APPEARANCES OF COUNSEL

*Andrew M. Lawler, P.C.* (*Moses Silverman, Kenneth Roth* and *Paul, Weiss, Rifkind, Wharton & Garrison* of counsel), for petitioner.

*Robert Abrams, Attorney-General* (*John Michael Ryan* of counsel), for respondent.

OPINION OF THE COURT

*Per Curiam.*

In this original proceeding pursuant to CPLR article 78, petitioner seeks to, *inter alia,* prohibit respondent from trying him under Indictment No. 3131/81 on the ground that he had been granted immunity from prosecution based on his testimony before a Suffolk County Grand Jury in April, 1980 "directly relating to the transactions charged in the indictment".

The two issues to be resolved on this proceeding are as follows:

(1) Can petitioner's claim of transactional immunity be raised in an original proceeding under CPLR article 78 for a writ of prohibition? and if it can,

(2) Did petitioner's testimony before the Suffolk County Grand Jury confer upon him immunity from prosecution for sales tax evasion and filing false sales tax returns as charged in the instant indictment?

I

In 1980 the District Attorney of Suffolk County convened a Grand Jury to investigate allegations concerning the Vantage Oil parkway gas stations. In connection with that investigation, the Suffolk County District Attorney issued a subpoena duces tecum directing petitioner, Martin Carey, to produce before the Grand Jury numerous books and records of petitioner's company, Petroleum Combustion International Inc. (hereinafter PCI), which operated gas stations on Long Island.

In addition to this subpoena duces tecum, the Grand Jury issued a subpoena ad testificandum directing petitioner to appear and give testimony. Petitioner appeared and testified to PCI's sales volume, his knowledge of that volume, his involvement in PCI's operation and his knowledge of PCI's financial situation. Specifically, the Grand Jury proceeding included the following questions and answers:

"Q. Are you familiar with P.C.I. Corporation?

"A. Yes, I am.

"Q. What does P.C.I. stand for?

"A. Petroleum Combustion International, Inc.

\* \* \*

"Q. What was your relationship to that business?

"A. I was the President of it from its inception.

"Q. What type of business was it in?

"A. It went into the business of operating gasoline stations.

"Q. Did you know Dick McKay, at that time? (phonetic spelling).

"A. Yes.

"Q. Who did you know him to be?

"A. He was also employed by the company and had a versatile capacity, as well.

\* \* \*

"Q. If you could, roughly, what was the amount of gasoline, per year, that was pumped by or supplied by P.C.I. to both its own stations and the lease holders?

"A. Well, depending upon the month of the year, on a yearly basis, I would assume that maybe in 1977 the total gallonage might be somewhere around 7 to 8 million gallons.

\* \* \*

"Q. Was there any difficulties that P.C.I. was experiencing in that time [in 1977]?

"A. We had been experiencing difficulty for a period of time, previous to that.

"Q. Is it fair to say that the only credit line that existed for P.C.I. was with Vantage Petroleum Corporation?

"A. Yes, we had very limited, if any, with Crown at the time, and the important volume of gasoline was with Vantage on somewhat of a credit basis.

"Q. If Vantage had called the credit line in, is it fair to say P.C.I. would have gone under?

"A. Yes, because at that time, to my knowledge, it was not heavily secured and that they could call a credit line at any time.

\* \* \*

"Q. There came a time in 1978 when the Salan Management contract was signed?

"A. Yes.

"Q. Would you explain how that came to be, sir?

"A. P.C.I. had run into additional financial difficulties. We had the leases pledged with Vantage Petroleum for some of the gasoline stations. At that time, it was felt that unless something was done to alleviate the situation, the leases could be in jeopardy.

\* \* \*

"Q. In a sense, is it fair to say that Vantage Petroleum, in light of the outstanding debt, owed to it by P.C.I., would now take over operation and management of P.C.I.?

"A. Yes, according to this contract.

\* \* \*

"Q. Mr. Carey, I direct your attention specifically to this meeting in 1978 at which Cheryl Iorizzo [of Vantage and Salan] placed two weapons on the table when you were discussing the Salan Management contract. Did Mr. Calamari [Mr. Carey's attorney] object, in any way, to your signing of this proposal?

"A. At the end of the entire contract, he called me aside and we went by ourselves and he considered it a rough contract, a difficult contract, and I think I was dismayed by that, because he didn't have much bargaining power.

"Q. Was that because of the fact that there were weapons on the table, or the economic condition of P.C.I. at that time?

"A. We had to be realistic that the economic condition was very bad."

Thereafter, the Attorney-General of the State of New York secured an indictment against petitioner charging him with 1 count of grand larceny in the second degree (sales tax evasion) and 16 counts of offering a false instrument for filing in the first degree (false sales tax returns). The following language was used in the indictment (the second count is representative of the other 15 false instrument counts):

"COUNTY COURT
COUNTY OF SUFFOLK
STATE OF NEW YORK

54

-----------------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,

 -against- Ind. No. 3131/81

MARTIN T. CAREY
RICHARD MACKAY,

 Defendants.

-----------------------------------------------------------------------X

### "FIRST COUNT

"THE GRAND JURY OF THE COUNTY OF SUFFOLK, by this indictment, accuse the defendants of the crime of GRAND LARCENY IN THE SECOND DEGREE, committed as follows:

"The defendants above-named in the County of Suffolk on or about and between March 18, 1977 and June 20, 1978 stole certain property from the State of New York having an aggregate value in excess of ONE THOUSAND FIVE HUNDRED ($1,500.00) DOLLARS.

### "SECOND COUNT

"THE GRAND JURY OF THE COUNTY OF SUFFOLK, by this indictment, further accuse the defendants aforementioned of the crime of OFFERING A FALSE INSTRUMENT FOR FILING IN THE FIRST DEGREE, committed as follows:

"The defendants on or about March 18, 1977 in the County of Suffolk, with intent to defraud the State and any political subdivision thereof and knowing that a written instrument, namely a New York State and Local Sales and Use Tax Return (Form ST-810), contained a false statement and false information, to wit, Gross Sales and Services and Taxable Sales and Services for the period December 1, 1976 to February 28, 1977 reported in an amount less than the true amount, did offer and present it to a public office and public servant, namely the New York State Department of Taxation and Finance, with the knowledge and belief that it would be filed with, registered, recorded in and otherwise become a part of the records of such public office and public servant."

Petitioner moved, *inter alia,* to dismiss the indictment on the ground that his testimony before the Grand Jury in April, 1980 had conferred upon him immunity from prosecution on the transactions charged in the indictment.

In support of the motion to dismiss on the ground of transactional immunity, petitioner argued that "the amount of sales tax due by PCI in 1977 can be easily calculated by taking PCI's gasoline volume and multiplying it by the then prevailing gasoline prices. Testimony on volume of gasoline sold for all practical purposes is testimony on sales tax due."

In the words of Special Term, petitioner also argued that "other, substantial portions of that prior testimony serve to demonstrate the defendant's working knowledge and active participation in PCI Corporation's affairs. This knowledge and participation are important factors, he has argued. This is because the People's case will require them to prove that the defendant knew of false statements in reporting taxes due. The charges arising from PCI's failure to report properly and pay taxes due, will require circumstancial [*sic*] evidence involving the defendant's knowledge of and familiarity with that corporation. Thus, key factors of proof in the People's case, which will rest in large measure upon circumstantial evidence, are related to the testimony previously given."

In opposition to the motion, the Attorney-General argued, *inter alia,* that (1) neither petitioner nor his corporation was a target of the investigation conducted by the Suffolk County District Attorney in 1980; (2) he did not learn of petitioner's April, 1980 Grand Jury testimony until June, 1982 and (3) his investigation, which resulted in Indictment No. 3131/81, did not arise out of, or flow from, the prior investigation by the Suffolk County District Attorney.

With regard to the substance of petitioner's Grand Jury testimony, the Attorney-General argued that his answers before the Grand Jury were introductory and general in nature and of no evidentiary value.

Special Term rejected outright all of the Attorney-General's arguments except for one, viz., that petitioner's testimony before the Grand Jury in April, 1980 was not sufficiently related to the transactions which were the subject of the instant indictment. Special Term characterized the latter issue as "close and difficult" and invited oral argument on the question as to "whether the testimony would

'tend' to a conviction within the meaning of *Matter of Doyle,* [257 NY 244] and how the quantum of testimony needed to confer immunity may relate to the nature of the crimes charged which are of the 'white collar' variety."

On January 12, 1983, after both sides had been heard, Special Term denied petitioner's motion, *inter alia,* to dismiss the indictment.

In so holding, Special Term concluded as follows: "In the present case the prior testimony is not sufficiently connected with the transactions involved to confer immunity from prosecution. While the prior testimony is related to the defendant's functions with P.C.I. the court cannot conclude that the defendant is now immune from any and all criminal charges that might be brought against the defendant involving his role as corporate president during the period about which he gave testimony. The fact that he was familiar with his corporation's operations is not a fact which will tend to a conviction of the current charges within the meaning of *Matter of Doyle,* 257 N.Y. 244, 256 cited in *People* v *Williams, supra.* To extend immunity in this case would be, as the People have argued, to create 'occupational immunity': immunity from all charges arising from a transaction in the course of a person's occupation simply because he has testified as to what he does to earn a living. The immunity does not extend that far."

The instant proceeding pursuant to CPLR article 78 seeking, *inter alia,* a writ of prohibition was then commenced by petitioner in this court.

II

The first question to be resolved in this proceeding is whether petitioner's claim of immunity from prosecution under Indictment No. 3131/81 may be asserted by way of proceeding pursuant to CPLR article 78 seeking a writ of prohibition.

■ This question should be answered in the affirmative.

The determinative factor regarding the propriety of writs of prohibition in criminal cases was clearly set forth by the Court of Appeals in *Matter of State of New York v King* (36 NY2d 59, 62-64) as follows:

"The extraordinary remedy either of prohibition or mandamus lies only where there is a clear legal right, and in the case of prohibition only when a court (if a court is involved) acts or threatens to act without jurisdiction in a matter of [sic] over which it has no power over the subject matter or where it exceeds its authorized powers in a proceeding over which it has jurisdiction (see, e.g., *Proskin* v. *County Ct. of Albany County*, 30 NY2d 15, 18; *Matter of Lee* v. *County Ct. of Erie County*, 27 NY2d 432, 436-437; *Matter of Hogan* v. *Culkin*, 18 NY2d 330, 335-336) * * *

"It would not be fruitful at this time to detail the several categories of excesses of jurisdiction and power arising in criminal actions, which merit the abrupt intervention of prohibition or mandamus. They always invoke * * * an unlawful use or abuse of the entire action or proceeding as distinguished from an unlawful procedure or error in the action or proceeding itself related to the proper purpose of the action or proceeding."

The writ of prohibition, however, cannot be used to prevent trial or litigation errors of substantive law or procedure (*La Rocca v Lane*, 37 NY2d 575). In accordance with these principles, writs of prohibition have been granted where the application has been based on grounds of double jeopardy and the privilege against self incrimination (*Matter of Abraham v Justices of N. Y. Supreme Ct. of Bronx County*, 37 NY2d 560; *Matter of Lee v County Ct. of Erie County*, 27 NY2d 432).

The claim of transactional immunity is similar to that of double jeopardy in that it challenges the legality of the "entire action or proceeding" (*Matter of State of New York v King, supra*, p 64) and to the privilege against self incrimination (see *People v Williams*, 81 AD2d 418, affd 56 NY2d 916). In the recent case of *Matter of Brockway v Monroe* (89 AD2d 771), the Third Department held that a claim of transactional immunity was cognizable by way of prohibition. Specifically, the court stated (pp 772-773): "The threshold question presented is whether an article 78 proceeding in the nature of prohibition lies to raise the instant issue. In this regard, it is well established that the remedy of prohibition is available only where there is a clear legal right and lies only when a court 'acts or threat-

ens to act without jurisdiction in a matter of [*sic*] over which it has no power over the subject matter or where it exceeds its authorized powers in a proceeding over which it has jurisdiction' (*Matter of State of New York* v *King,* 36 NY2d 59, 62). If petitioner is correct in his contention that he is immune from prosecution, the District Attorney and County Court would be acting in excess of their powers (see CPL 50.10 *et seq.*). Despite this fact, prohibition is an extraordinary remedy which is not ordinarily available in criminal cases as a method of appeal from intermediate orders. Accordingly, except in extraordinary situations, prohibition will not lie if the alleged errors can be corrected by way of appeal from a subsequent conviction (see, e.g., *Matter of Dondi v Jones,* 40 NY2d 8; *Matter of State of New York v King,* 36 NY2d 59, *supra*). If, however, an appeal would be inadequate to prevent the harm, and prohibition would provide a more effective remedy, it may lie even though the error could be addressed on appeal (*Matter of Lee v County Ct. of Erie County,* 27 NY2d 432, cert den 404 US 823; McLaughlin, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR 7801:5, pp 32-34; see, also, *La Rocca v Lane,* 37 NY2d 575, 579-580, cert den 424 US 968). In the present case, if prohibition is found not to lie, defendant will be forced to submit to further prosecution, and if convicted, to raise his claim of immunity on appeal from the judgment of conviction (see *People ex rel. McLaughlin v Monroe,* 44 AD2d 575). Upon the instant record we find that it is proper for this court to entertain petitioner's application. Although not all constitutional issues are reviewable by way of prohibition (see, e.g., *Matter of Blake v Hogan,* 25 NY2d 747, 748), the Court of Appeals has found prohibition to lie where, as here, the proceeding is based upon petitioner's assertion of his fundamental right against self incrimination (*Matter of Lee v County Ct. of Erie County,* 27 NY2d 432, cert den 404 US 823, *supra;* cf. *Matter of Felder v New York State Supreme Ct.,* 44 AD2d 1). Accordingly, while adhering to the well-settled rule that 'the remedy of prohibition is an extraordinary one which is only available in rare cases' (*Matter of Lee v County Ct. of Erie County, supra,* p 438), we hold that the present case presents an issue cognizable by way of

prohibition." Nor does the fact that petitioner made a motion to dismiss the indictment bar the granting of the writ of prohibition in this case. In *Matter of Brockway v Monroe* (*supra*, p 772), the claim of transactional immunity was allowed to be raised by an application for a writ of prohibition, even though a prior motion to dismiss the indictment had been made. In *Matter of Wiley v Altman* (52 NY2d 410), a proceeding seeking a writ of prohibition based on a claim of double jeopardy was allowed despite the fact that a motion to dismiss had been made. Specifically, the Court of Appeals stated (pp 412-413, n 2): "An aggrieved defendant may, however, as here, seek review in the Appellate Division by way of an article 78 proceeding (see, e.g., *Hall v Potoker,* 49 NY2d 501, 505, n 1; *Matter of Abraham v Justices of N.Y. Supreme Ct. of Bronx County,* 37 NY2d 560, 564) irrespective of the fact that he has made a motion to dismiss in the trial court". Accordingly, the claim of transactional immunity is properly cognizable by way of a proceeding pursuant to CPLR article 78, in the nature of prohibition.

III

Turning to the merits of the instant proceeding, we must first focus on the relevant statutes.

CPL 50.10 provides as follows:

"1. 'Immunity.' A person who has been a witness in a legal proceeding, and who cannot, except as otherwise provided in this subdivision, be convicted of any offense or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which he gave evidence therein, possesses 'immunity' from any such conviction, penalty or forfeiture. A person who possesses such immunity may nevertheless be convicted of perjury as a result of having given false testimony in such legal proceeding, and may be convicted of or adjudged in contempt as a result of having contumaciously refused to give evidence therein.

"2. 'Legal proceeding' means a proceeding in or before any court or grand jury, or before any body, agency or person authorized by law to conduct the same and to administer the oath or to cause it to be administered.

"3. 'Give evidence' means to testify or produce physical evidence."

CPL 190.40 focuses particularly on the testimony of a witness before a Grand Jury, reading, so far as pertinent, as follows:

"1. Every witness in a grand jury proceeding must give any evidence legally requested of him regardless of any protest or belief on his part that it may tend to incriminate him.

"2. A witness who gives evidence in a grand jury proceeding receives immunity unless:

"(a) He has effectively waived such immunity pursuant to section 190.45; or

"(b) Such evidence is not responsive to any inquiry and is gratuitously given or volunteered by the witness with knowledge that it is not responsive.

"(c) The evidence given by the witness consists only of books, papers, records or other physical evidence of an enterprise, as defined in subdivision one of section 175.00 of the penal law, the production of which is required by a subpoena duces tecum, and the witness does not possess a privilege against self-incrimination with respect to the production of such evidence. Any further evidence given by the witness entitles the witness to immunity except as provided in subdivisions (a) and (b) of this section."

As noted by this court in *People v Williams* (81 AD2d 418, 421, *supra*), the language of these statutes "construed as a whole, appears clear: absent a waiver, a witness before the Grand Jury responding directly to questioning legally addressed to him, cannot be convicted of an offense for any transaction concerning which he gave testimony."[*] In addressing the scope of the immunity conferred upon a witness who testifies before the Grand Jury, former Justice HOPKINS wrote for this court as follows (pp 424-426):

"We are not without signposts from the past which point the direction for our decision. Chief Judge CARDOZO wrote

---

[*] Although CPL 50.10 (subd 1) speaks of a "conviction" being barred by transactional immunity, case law has held that the word "prosecution" may be used interchangeably with "conviction" (see *People v Rappaport,* 47 NY2d 308, 313; *Matter of Anonymous Attorneys,* 41 NY2d 506, 510; *Matter of Second Additional Grand Jury of County of Kings [Cioffi],* 8 NY2d 220, 224; *People v Riela,* 7 NY2d 571, 576).

that '[i]t is enough, to wake the privilege into life, that there is a reasonable possibility of prosecution, and that the testimony, though falling short of proving the crime in its entirety, will prove some part or feature of it, will *tend* to a conviction when combined with proof of other circumstances which others may supply' (*Matter of Doyle,* 257 NY 244, 256, *supra*). Earlier cases had alluded to the metaphor of the testimony constituting a 'link' in the 'chain of facts' against defendant (see, e.g., *People ex rel. Taylor v Forbes,* 143 NY 219, 228-231; *People v Priori,* 164 NY 459, 466; *People ex rel. Lewisohn v O'Brien,* 176 NY 253, 264), a metaphor still in use in cases subsequent to *Doyle* (see, e.g., *People ex rel. Coyle v Truesdell,* 259 App Div 282, 286; *People v Nationwide News Serv.,* 172 Misc 857).

"The degree to which the privilege has been enforced is illustrated in *People ex rel. Coyle v Truesdell (supra).* There the defendants were grocers charged with conspiracy to bribe a public relief officer by giving the latter 50% of the value of relief orders placed with the stores of the defendants. Called before the Grand Jury, one of the defendants, after stating his address, was asked if that was his store and residence, and he answered 'Residence and store both.' This, the court said (p 286), 'may very well be a link in the chain of proof against him.'

"We think that the reference in the cases to the testimony as reflecting a link in the chain of facts against the witness is but an expressive means of describing the tests expounded by Chief Judge CARDOZO in *Doyle (supra)* * * *

"We should not indulge in rarified refinements and overly subtle shades of difference between tests of incriminatory testimony resulting in immunity bottomed on whether the testimony elicited before the Grand Jury was 'relevant' or 'substantial' or 'material' (cf. *People v Lieberman,* 94 Misc 2d 737; *People v Gerald,* 91 Misc 2d 509; *Matter of Jaime T.,* 96 Misc 2d 173). These linguistic aids are merely descriptive labels and not rigid models; the true test is, as Chief Judge CARDOZO said in *Matter of Doyle* (257 NY 244, 256, *supra*), whether 'the testimony * * * will prove some part or feature of it [the crime], will *tend* to a conviction when combined with proof of other circumstances which others may supply.' The word 'tends' thus is

used in the light of 'helps' or 'contributes' to the witness' incrimination for the crime concerning which he testified." Nor does a different standard exist with respect to white collar crimes, as suggested by Special Term. In 1975 (L 1975, ch 454, § 1, eff July 24, 1975) the Legislature added CPL 190.40 (subd 2, par [c]) to specifically preclude the granting of immunity to a witness before a Grand Jury who gives evidence consisting "only of books, papers, records or other physical evidence of an enterprise, as defined in subdivision one of section 175.00 of the penal law, the production of which is required by a subpoena duces tecum, and the witness does not possess a privilege against self-incrimination with respect to the production of such evidence." The purpose of this legislation was to facilitate the prosecution of the white collar crimes which were prevalent in the nursing home industry.

Specifically, the memorandum of the State Executive Department (NY Legis Ann, 1975, p 2) states the following:

"The bill was introduced at the request of Joseph J. Hynes, Deputy Attorney General for Health and Social Services (Special Prosecutor). In order for the Special Prosecutor to effectively discharge his duties to determine whether the owners and operators of nursing homes and the businesses which supply goods and services to them have illegally profited at the expense of the elderly people they are supposed to serve or the State of New York, it is essential that the books and records of those entities, which cannot claim a privilege against self-incrimination be examined. The bill would make it perfectly clear that an individual who merely produces such books or records on behalf of a corporation or other independent entity does not thereby receive immunity.

"The provisions of the bill would apply only to the production of books, papers, records or other physical evidence of an 'enterprise'. That term is defined in subdivision two [sic] of Section 175.00 of the Penal Law as 'any entity of one or more persons, corporate or otherwise, public or private, engaged in business, commercial, professional, industrial, eleemosynary, social, political or governmental activity.' "

In *People v Perri* (95 Misc 2d 767, affd 72 AD2d 106, affd 53 NY2d 957), pursuant to a subpoena ad testificandum, the defendant gave handwriting exemplars before a Grand Jury investigating fraudulent applications for financial assistance from the Economic Development Administration of the City of New York. Thereafter, defendant was indicted for several crimes including offering a false instrument for filing. In affirming Criminal Term's order granting defendant's motion to dismiss the indictment based on transactional immunity, this court stated (72 AD2d, at pp 110-111):

"The inferences the People would draw from the memorandum fail in light of the extremely specific factual predicate incorporated into the amendment, viz., that the witness appear pursuant to a subpoena duces tecum for the sole purpose of producing the books and records of *an enterprise*. Indeed, the language of the amendment cautions that '[a]ny further evidence given by the witness entitles the witness to immunity except as provided in subdivisions (a) and (b) of this section' (CPL 190.40, subd 2, par [c]). Had the Legislature truly intended that immunity be coextensive with a witness' Fifth Amendment privilege, it could have easily insured that objective by merely deleting the words, 'or produce physical evidence' from the definition of 'give evidence' contained in CPL 50.10 (subd 3).

"Insofar as the People suggest that the three exceptions codified in CPL 190.40 are not all-inclusive, their premise runs contrary to both the explicit language of the statute and the historical foundation for its current wording."

Nowhere in our decision in *People v Perri* (*supra*) is there the slightest indication that the principles governing transactional immunity are somehow different in the area of white collar crimes.

■ Applying the principles of *People v Williams* (81 AD2d 418, *supra*), to the Grand Jury testimony at bar leads to the conclusion that the petition for a writ of prohibition must be granted.

In the instant prosecution, the People would have to show that PCI's reported sales volume was different from its actual sales volume. Clearly, petitioner's testimony at

the Grand Jury regarding the amount of gasoline supplied by PCI, viz., "somewhere around 7 to 8 million gallons" would *"tend* to a conviction when combined with proof of other circumstances which others may supply" (*Matter of Doyle,* 257 NY 244, 256, *supra; People v Williams, supra*).

With regard to the crime of offering a false instrument for filing in the first degree, it would be incumbent upon the People to prove that even assuming the sales tax returns were false, petitioner was sufficiently involved in the operation of PCI to know they were false. In this regard it must be noted that there is no evidence that petitioner prepared the sales tax returns in question, and his signature does not appear on all the returns. Moreover, according to a report prepared by the prosecution's handwriting expert, it appears that someone else signed petitioner's name on many of the returns on which petitioner's signature does appear. Under these circumstances, evidence of petitioner's knowledge of and involvement in PCI's affairs, including knowledge of any financial difficulties experienced by PCI, would be crucial in demonstrating that petitioner knew that the returns were false and that he had a reason for submitting false returns. The Grand Jury testimony given by petitioner was responsive to the questions asked of him and did relate to his involvement in PCI's operation and his knowledge of PCI's sales volume and financial situation. Accordingly, pursuant to the principles set forth in *Matter of Doyle* (257 NY 244, *supra*) and *People v Williams* (81 AD2d 418, *supra*) petitioner's application for a writ prohibiting the respondent from trying him under Indictment No. 3131/81 must be granted.

This case should again serve as a reminder to law enforcement officials of the consequences of calling a witness before a Grand Jury without obtaining a waiver of immunity. In the absence of such a waiver, the responses of the witness to questions posed by the prosecutor, may, as in the case at bar, clothe the witness with immunity from prosecution for any transaction concerning which he gave testimony.

Petitioner also moves to stay all proceedings in an action entitled *People v Carey,* pending determination of this CPLR article 78 proceeding. In light of our determination

of the article 78 proceeding the motion is dismissed as academic.

LAZER, J. P., MANGANO, THOMPSON and WEINSTEIN, JJ., concur.

Petitioner's application for a writ prohibiting the respondent from trying him under Indictment No. 3131/81 is granted and the motion for a stay is dismissed as academic.