OPINION OF THE COURT
Rena K. Uviller, J.
This motion to dismiss an indictment underscores the pitfalls of New York’s excessively broad immunity law. It demonstrates how a Grand Jury witness who is engaged in illegal activity can be inadvertently insulated from prosecution by seemingly innocuous questions posed to him by a prosecutor who had no reason to suspect the witness’ criminality. In this case, New York’s statutory scheme serves to abort the prosecution of a lawyer who has allegedly stolen more than $350,000 from his client and then forged documents to conceal the theft.
Defendant Steven Weisman, an attorney, has been indicted for grand larceny, forgery and related crimes. The People allege that he stole a check belonging to one of his clients, the General Motors Acceptance Corporation (GMAC), and that he forged an affidavit and a bank statement in order to conceal the theft. Defendant claims he is immune from prosecution for these crimes by virtue of his appearance as a witness before a Grand Jury investigating unrelated criminal conduct by another person, Raphael Pantoja.
Five of the seven counts against the defendant were previously dismissed. This opinion will explain my reasoning and is *570 intended to urge the Legislature to revisit New York’s immunity statutes. As this case dramatically illustrates, the nature of the immunity conferred by the statute is excessive; its application has been unduly broad; its automatic bestowal can have unforeseeable and unfortunate consequences.
FACTS
In 1994 Raphael Pantoja contracted to purchase a Manhattan condominium apartment, to be financed in part with personal funds and in part with a loan secured by a mortgage; he obtained the mortgage from GMAC, a mortgage lender. Defendant Weisman was GMAC’s attorney for this transaction, and at the August 1994 closing, he handed over GMAC’s check for more than $350,000 to the seller’s mortgagee, First Atlantic Bank.
After the closing, Pantoja’s personal checks to the sellers bounced, and the sellers brought a civil action to rescind the sale. To effect the recision, the sellers, on or about October 7, 1994, returned to Weisman the check which he had given to First Atlantic at the closing; the return was in the form of a check made payable to Weisman, as attorney for GMAC. Instead of returning the check to GMAC, as he was obliged to do, the People allege that Weisman deposited it into his own IOLA account, using it to pay his personal and professional expenses. This is the basis of count 1 of the indictment, charging Weisman with second degree grand larceny.
In December 1994, in connection with the recision lawsuit by the sellers against Pantoja, Weisman was asked by the sellers’ attorney to submit an affidavit attesting that the loan from GMAC had indeed been returned to GMAC by First Atlantic. The People allege that Weisman prepared a false affidavit which purported to be made and signed by Frank J. Monte-forte, a vice-president of GMAC, attesting that the mortgage funds had been returned to GMAC. (Hereafter, the Monteforte affidavit.)
It is further alleged that Weisman submitted this affidavit to Justice Alice Schlesinger, who presided over the recision action and who relied on the affidavit in granting the recision. These allegations regarding the Monteforte affidavit are the basis for count 4 (forgery in the second degree), count 5 (offering a false instrument for filing) and count 6 (making an apparently sworn false statement in the first degree).
In the meantime, the District Attorney undertook a criminal investigation of Pantoja’s activities, including his fraudulent *571 obtaining of the GMAC mortgage loan. On February 28, 1995, Weisman was called as a witness before the Grand Jury that was considering the charges against Pantoja. At this point, Weisman was unsuspected of any wrongdoing; in fact, GMAC had not yet discovered that the Pantoja mortgage funds had not been returned. Weisman, at his request, was provided with a Grand Jury subpoena. He signed no waiver of immunity before he testified, nor was a waiver requested of him. (CPL 190.45 [1].)
At the very end of his testimony to the Pantoja Grand Jury Weisman was asked a few brief questions regarding Pantoja’s application for the loan from GMAC and the events at the closing. Specifically, Weisman was asked and responded to inquiries relating to the money returned by Atlantic to GMAC and to the Monteforte affidavit, as follows:
"q * * * what happened after the phone conversation [with Mr. Dogan, the seller’s attorney]?
"A. Mr. Dogan told me too, that he was commencing an action in State Supreme Court to have the deal rescinded based upon fraud, that I would be getting a copy of his papers. About two weeks later I received some papers. I was asked to submit an affidavit. And the case is still pending.
"Q. What happened with regard to GMAC’s money?
"A. Atlantic Bank, after about a month of back and forth, was required to send the money back to GMAC.
"Q. And did it so do?
"A. Yes.”
Some time after the Pantoja Grand Jury proceedings, GMAC finally discovered that it had never received the mortgage check which Atlantic Bank had sent to Weisman, and contacted Weisman to inquire. It is alleged that in response to these inquiries, Weisman lied and told GMAC that he had already sent GMAC his personal check for the amount of the returned funds. To substantiate this false assertion, it is further alleged that Weisman, in August 1995, sent GMAC a facsimile transmission of what he claimed was the face of the check he had sent to GMAC, as well as a purported copy of his own bank statement, which had been altered to reflect falsely that the amount of the returned funds had been deposited in Weisman’s account and then withdrawn, presumably in the form of a check to GMAC.
These allegations as to false documentation submitted to GMAC are the subject of count 2 (forgery in the second degree), *572 relating to the face of the check, and count 3 (forgery in the second degree), relating to the altered bank statement.[1]
Defendent’s Contentions
Defendant asserts that he cannot be prosecuted for any of the crimes in the indictment by virtue of CPL 190.40 (2) and 50.10, which confer complete immunity from prosecution to a witness for any transaction about which he gave truthful and responsive answers to a Grand Jury. Weisman argues that because he answered questions before the Pantoja Grand Jury about the money that First Atlantic returned to GMAC, and about the affidavit to that effect, which he was asked to prepare in connection with the seller’s recision action against Pantoja, he may not be prosecuted for the theft of that money from GMAC, or for the forgery and false filing of the Monteforte affidavit; he also claims immunity regarding the forgery of his bank statement which was allegedly intended to cover up the theft.
LAW
Transactional versus Use Immunity
Immunity statutes, Justice Powell observed in Kastigar v United States (406 US 441, 446), are deeply rooted in Anglo-American jurisprudence: they reflect the effort to "seek a rational accommodation between [on the one hand] the legitimate demands of government to compel citizens to testify” and, on the other hand, the citizen-witness’ Fifth Amendment privilege against self-incrimination. In striking the balance between a citizen’s right not to bear witness against herself and the government’s right to every person’s evidence, Kastigar reaffirmed that any testimony the government compels the witness to give must result in no future adverse consequences to her.
Kastigar (supra), however, repudiated the Supreme Court’s earlier dicta in Counselman v Hitchcock (142 US 547), which had asserted that in order to protect the witness’ privilege sufficiently, she must be insulated entirely from future prosecution for any crime related to her compelled testimony. In rejecting such so-called "transactional” immunity, Justice Powell observed that the radical step of entirely prohibiting the witness’ prosecution confers more, rather than commensurate or *573 coterminous, protection than that accorded by the Fifth Amendment itself. For if the witness had successfully asserted the privilege and withheld the testimony, the government would not be prevented from prosecuting if evidence other than the withheld testimony were available.
Accordingly, Kastigar (supra) sustained the validity of the newly enacted Federal immunity statute (18 USC §§ 6002, 6003), which did not insulate the witness entirely from future prosecution. Rather, the Federal immunity statute prevented future government use, not only of the compelled testimony itself, but also of any evidence derived from that testimony. (So-called "use and derivative use” immunity.) Use immunity, Justice Powell reasoned, appropriately provides the witness with the same, but not greater, protection than she would have had if she had refused to testify in the first place.
Following Kastigar (supra), most, if not all the States excepting New York, revised their statutes and Constitutions to confer use, as opposed to transactional, immunity upon witnesses who testify under compulsion. By contrast, New York’s CPL 190.40, which sets forth the duties and protections of a Grand Jury witness in this State, adheres to transactional immunity, providing in pertinent part, that:
"1. Every witness in a grand jury proceeding must give any evidence legally requested of him regardless of any protest or belief on his part that it may tend to incriminate him.
"2. A witness who gives evidence in a grand jury proceeding receives immunity unless:
"(a) He has effectively waived such immunity pursuant to section 190.45; or
"(b) Such evidence is not responsive to any inquiry and is gratuitously given or volunteered by the witness with knowledge that it is not responsive.”
The nature and scope of the immunity thus conferred by CPL 190.40 is described by CPL 50.10 (1), as follows: "1. 'Immunity. ’ A person who has been a witness in a legal proceeding, and who cannot, except as otherwise provided * * * be convicted of any offense or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which he gave evidence therein, possesses 'im *574 munity’ from any such conviction, penalty or forfeiture.” (Emphasis added.)[2]
Taken together, the statutory language is clear: Absent a waiver, a witness before a Grand Jury who gives responsive answers to questions legally addressed to him, cannot be prosecuted for an offense regarding any transaction concerning which the witness testified. (People v Williams, 81 AD2d 418, affd 56 NY2d 916; see also, People v Rappaport, 47 NY2d 308, 313.) Even if there exists other evidence of the witness’ culpability — evidence wholly independent of, and not derived from, the witness’ Grand Jury testimony — no prosecution is availing if the witness’ testimony concerned the transaction for which that witness’ future prosecution is sought. (People v Williams, supra; People v Rappaport, supra.)
The Breadth of Transactional Immunity
The question that immediately surfaces, given New York’s adherence to transactional immunity, is whether the transaction about which the witness testified in the Grand Jury is the same transaction for which the People now wish , to prosecute him. Indeed, the People here argue that Weisman’s brief Grand Jury testimony about First Atlantic returning the money to GMAC, and about the seller’s request for an affidavit to that effect, is hardly the same transaction as Weisman’s own alleged independent theft of the money from GMAC, or his forgery of the Monteforte affidavit and its later filing in the seller’s recision action.
What constitutes the “same transaction” can, of course, be read broadly or narrowly. Read narrowly, the same transaction might mean that the witness is immunized only when his Grand Jury testimony is the equivalent of a confession to the crime for which he is now being prosecuted. At the other extreme, the witness is immunized whenever his Grand Jury testimony, although only alluding peripherally to facts underlying the current indictment, is essentially foreign to the present crime. (See, People v Williams, 81 AD2d 418, 424, supra.)
While appellate interpretation of what constitutes testimony about the "same transaction” — and hence the sweep of the immunity conferred — is sparse, it appears that the Court of Appeals has read the term generously. (See, People v Williams, 56 *575 NY2d 916, supra; People v McFarlan, 42 NY2d 896.) In Williams the Court of Appeals adopted the analysis and reasoning of the Appellate Division, which began by reiterating the unassailable principle that the immunity conferred on the witness by his Grand Jury testimony had to be " 'coterminous with what otherwise would have been the [Fifth Amendment] privilege of the person concerned’ ”. (People v Williams, 81 AD2d 418, 422, supra, quoting Heike v United States, 227 US 131, 142, citing Counselman v Hitchcock, 142 US 547, 585, supra.)
The Appellate Division then went on to describe what kind of testimony is incriminating and thereby confers immunity. Harkening to the language of Chief Judge Cardozo in Matter of Doyle (257 NY 244, 256), Williams (supra) held that testimony which triggers the privilege and thereby confers immunity is that testimony which, " 'though falling short of proving the [instant] crime in its entirety, will prove some part or feature of it, will tend to a conviction when combined with proof of other circumstances which others may supply.’ ” (People v Williams, 81 AD2d, supra, at 424, citing Matter of Doyle, 257 NY 244, 256.)
Under this broad formulation, the prior testimony need not amount to an admission of guilt by the Grand Jury witness. Nor need it have directly concerned the crime with which the People now wish to charge him. Rather, Williams (supra) held, the witness’ Grand Jury testimony immunizes him if it "reflect[s] a link in the chain of facts against the witness” if the prior testimony "helps” or "contributes” to the witness’ incrimination. (People v Williams, 81 AD2d, supra, at 424, 426; Matter of Carey v Kitson, 93 AD2d 50.)
Thus, in Williams (supra), the defendant had testified before a Grand Jury investigating a homicide for which another person, John Ford, was the chief suspect. Williams’ testimony related to events occurring earlier on the evening of the murder; he placed Ford at the crime scene and provided Ford with a motive. Williams’ description of his own conduct that night did not implicate himself in the murder in any way.
The Appellate Division (and the Court of Appeals) nevertheless concluded that Williams’ Grand Jury testimony completely immunized him from prosecution for the homicide. This was because Williams had acknowledged that he, too, was in the victim’s company on the night of the crime, that he remained on friendly terms with her after she had quarreled with Ford, and that the victim had expressed an intent to keep her door locked against entry by Ford. From this testimony, the Court *576 reasoned that it could be inferred that the victim unlocked her door to Williams later in the evening, thereby giving him, as well as Ford, an opportunity to commit the crime. The mere possibility that such an inference could be drawn was sufficient to confer immunity on Williams.
In this case, the inferences to be drawn from Weisman’s testimony before the Pantoja Grand Jury are as potentially damaging as those in Williams (supra). Although Weisman did not expressly testify as to his own conduct (he stated only that First Atlantic sent the money back to GMAC, and that he was asked to submit an affidavit for the recision suit attesting to that fact), those seemingly innocuous statements could be used " '[to] prove some part or feature’ ” of the crimes with which he is now charged. (People v Williams, supra, at 426, citing Matter of Doyle, 257 NY 244, 256, supra.)
Thus, defendant’s acknowledgment that First Atlantic returned the money to his client, GMAC, could serve to establish that he (Weisman) received the money, and that he knew it belonged to GMAC — tending to establish the larceny. Weisman’s testimony that he was asked to submit an affidavit in connection with the seller’s recision suit permits the inference that he prepared the affidavit and that he knew it was to be filed with the court — tending to prove the forgery and false filing of the Monteforte affidavit.
Defendant’s Grand Jury testimony thus ”tend[s] to a conviction when combined with proof of other circumstances which others may supply.” (People v Williams, 81 AD2d, supra, at 426; Matter of Carey v Kitson, 93 AD2d 50, supra.) His prosecution for the larceny, and for the forgery and filing of the Monteforte affidavit, is thereby foreclosed by virtue of the New York statute and the breadth of its application — despite evidence which may be available that is wholly independent of, and not derived from, his Grand Jury testimony.
Automatic Conferral of Immunity
Weisman’s insulation from prosecution for most of the crimes charged, as a result of his brief testimony about a matter peripheral to the Pantoja Grand Jury’s inquiry, is rendered even more disturbing by the fact that the prosecutor, when he asked the questions, had no reason to suspect his own witness of criminal activity. Indeed, at the time of the Grand Jury, GMAC was itself unaware that the money had not been returned to it.
This inadvertent immunization is the consequence of yet another distinctive feature of New York immunity law, to wit, *577 the automatic conferral of immunity without the need for a verbal claim of privilege by a Grand Jury witness. (CPL 190.40 [2]; People v Williams, 56 NY2d 916, supra.) A trial witness, by contrast, is not immunized without a clear assertion of the privilege after the question is posed, and a direction by the Judge to answer. (CPL 50.20 [4]; People v Flihan, 131 AD2d 269.) Yet under the current State of New York law, no such triggering claim of the privilege is required of a Grand Jury witness.[3] And while it is not too much to require caution from prosecutors when calling witnesses to the Grand Jury, no amount of care would have been availing in this case: The subject of the Grand Jury’s inquiry was Pantoja’s fraudulent loan application from GMAC; the prosecutor called GMAC’s lawyer as an incidental player in the loan transaction. He had no way of knowing that the lawyer-witness allegedly had himself stolen from GMAC independently.
Future Crimes
However broad the scope of immunity in New York, it does not extend to crimes committed after the immunizing testimony. (Matter of Gelinas v Barrett, 147 AD2d 293.) Thus, defendant cannot avoid prosecution for the forgery of his bank statement, which allegedly occurred several months after his appearance before the Pantoja Grand Jury.[4] That the forgery may have been a "cover-up” crime — i.e., designed to conceal defendant’s theft from GMAC, which allegedly occurred prior to his Grand Jury testimony — does not render it part of the crime it was intended to conceal. Rather, the alleged forgery of the bank statement was a separate and subsequent event.
Immunity does not flow to a future crime because the rationale for the immunization (to wit, securing the privilege against self-incrimination) is absent. Since the alleged forgery of the bank statement had not yet occurred when defendant *578 testified, he had no privilege to assert regarding it, and therefore no immunity was required. (See, United States v Gallo, 859 F2d 1078; People v Lieberman, 94 Misc 2d 737.) This is in accord with the principle that the law never protects a person from the consequences of a crime that may be committed in the future. (See, e.g., People v Bell, 73 NY2d 153; People v Middleton, 54 NY2d 474 [defendant’s uncounseled custodial statements admissible where statements constitute separate act of bribery]; see also, People v Lieberman, 94 Misc 2d 737, 746, supra.)
Based on the foregoing, defendant’s motion to dismiss the indictment is granted as to counts 1, 4, 5 and 6, and denied as to count 3.

. Count 2 has been dismissed based on the People’s concession that defendant cannot be guilty of forgery of his own check.

. CPL 50.10 (1) further provides that "[a] person who possesses such immunity may nevertheless be convicted of perjury”.

. Although section 2447 of the former Penal Law (later Code Grim Pro § 619-c) required a Grand Jury witness to claim the privilege before immunity was conferred, this provision was eliminated with the passage of the present CPL. (See, People v Williams, supra; People v Chapman, 69 NY2d 497.)

. This is the only one of the charged crimes that occurred after defendant’s Grand Jury appearance. Although the indictment charges that the "affidavit crimes” each occurred on or about March 28, 1995, the evidence before the Grand Jury indicates that the actus reus of these crimes occurred in December 1994. The March 28,1995 date represents the date when the clerk of the Civil Term of Supreme Court filed the affidavit, not when defendant allegedly forged it or offered it for filing.